In re David W. SHRIVER, Karen S. Shriver, Debtors.

David W. SHRIVER, Karen S. Shriver, Plaintiffs,

v.

James TINGLEY, et al., Defendants.

Bankruptcy No. 82–01422.
Adv. No. 82–0871.

United States Bankruptcy Court,
N.D. Ohio, W.D.

Feb. 21, 1985.

---

1. If the point here is unduly labored, it is because attorneys are persistent that *In re Lorren* is controlling.

John D. Noble, Wauseon, Ohio, for plaintiff.

Steven L. Diller, Toledo, Ohio, Phil W. Campbell, Childs, Childs & Fortney Co., Van Wert, Ohio, for defendants.

## OPINION AND ORDER

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on to be heard upon plaintiff's complaint to find the defendants in violation of the automatic stay provided by 11 U.S.C. § 362, and upon his request for damages as a result of that alleged violation, as well as for trespass, conversion, breach of contract and upon the defendant's briefs in opposition thereto. The court finds that although a technical violation of stay occurred it was without knowledge or notice to defendants and further-more, plaintiff through his agent, consented to the repossession of the collateral. The court finds further that upon the facts and circumstances of this case an award of damages or attorney fees is not appropriate and therefore plaintiff's complaint should be dismissed.

## FACTS

The defendants James and Craig Tingley sold 28 head of cattle to the plaintiff in June of 1980 for $29,850.00. The terms of the security interest purchase agreement provided that the debt was payable in 36 monthly installments. The defendants Homer and Joy Kraner sold 21 head of cattle to the plaintiff on March 26, 1982 for the sum of $16,800.00, which according to the security interest purchase agreement signed by the parties, was payable in 36 monthly installments. The plaintiff assigned his right to payment from the company that picked up his milk (Milk Marketing, Inc.) to the defendants. The last payment received by the defendants from Milk Marketing was in June of 1982 for the milk delivered in May of 1982. The plaintiffs filed for reorganization under Chapter 11 of the United States Bankruptcy Code on July 1, 1982. Notice of the entry of an order for relief was mailed to all creditors on August 3, 1982.

Having heard on July 8, 1982 through the farmers grapevine that the plaintiff may have filed bankruptcy, the defendants went to the plaintiff's farm to explore the rumor. When the defendants arrived they were met by the plaintiff's hired hand, Dale Obringer, who through the course of conversation told the defendants he had been working for the plaintiff for approximately one month and that the plaintiff had gone to Missouri leaving him in charge. Mr. Obringer testified at trial that he did not inform the defendants about plaintiff's bankruptcy because he had not been made aware of it. It appears from the facts that only the plaintiff, his father, and the attorney who filed the case knew of the Chapter 11 which was filed just prior to the plaintiff leaving for Missouri.

The defendants claim their actions were not a mad dash to plaintiff's farm to grab the collateral. Instead, they urge that due to the nature of the collateral it was important to make sure that the cattle were in good health and would be adequately cared for. Defendants' actions substantiate that claim. They arrived at the farm in a pick-up truck which is unsuitable for hauling cattle. In an effort to ascertain plaintiff's financial condition, Craig Tingley was dispatched to visit the plaintiff's brother in law, Dennis Stroh, who informed Mr. Tingley that he didn't know anything about the plaintiff's financial affairs. While defendants were at the farm other events took place which caused them to question the health and safety of the cattle.

Creditors began to arrive at the farm and repossess their goods. Among those were the fuel company who without Mr. Obringer's personal promise to pay for 50 gallons of gas would have removed all of it leaving nothing to power the fork lift which was necessary to move feed supplement to the cattle. During this period of chaotic activity the defendants began an inspection of the cattle which revealed the majority of the herd was of below average quality with some requiring immediate veterinary attention.

Next to arrive on the scene was the plaintiff's father. At some point he approached the defendants and upon learning that they were considering removing the cattle he warned them that his son was in Chapter 11 and he thought they might be in trouble if they took the cows. The plaintiff's father did not give the defendants his son's phone number or the name of his attorney.

In an attempt to protect the cattle and yet keep their actions within the law, the defendants called their attorney and asked him for advice. The attorney had his secretary phone the Bankruptcy Court Clerk's Office and unfortunately for whatever reason she was told that no petition had been filed. Based on that information the attorney told the defendants they should post a notice of default and move the cattle where they would be fed and cared for. Shortly thereafter the plaintiff called Mr. Obringer who was in the barn.

Mr. Obringer told the plaintiff that the defendants were considering removing the cattle to which the plaintiff replied "tell them they can take them." The plaintiff did not ask to talk with the defendants. Instead he called his attorney who called the farm and asked to speak to the defendants. The defendants, who had seen creditors removing goods, observed their cattle in poor condition with the owner out of state, (and no idea when he was returning), and after having been told to go ahead and take the cattle by the plaintiff, and finally upon advice from an attorney that they could do so, made up their minds to take the cattle and refused to talk to the plaintiff's attorney.

The defendants thereupon procured a trailer and loaded the cattle 4 or 5 at a time with the help of Mr. Obringer and moved them 5 miles to Mr. Oehrtman's farm. The plaintiff returned on approximately July 15. Neither he nor his attorney requested the return of the cattle. When the defendants became aware of plaintiff's Chapter 11, they filed a complaint on August 26, 1982 for relief from stay and in the alternative offered to return the cattle to the plaintiff and to restore him to the status quo. Instead the plaintiff chose to file a complaint on August 27, 1982 in an action for violation of stay. Upon agreement of the parties and pursuant to this Court's Order of November 9, 1982, the cattle were sold.

## DISCUSSION

Both this court and defense counsel found it difficult to determine the plaintiff's cause(s) of action and the basis for it (them). In his one page trial brief the plaintiff merely provided the following laundry list under the title "Plaintiff's Causes of Action Are":

A. Violation of Automatic Stay

B. Willful, Knowing, Wanton and Deliberate Act Entitling Plaintiff to Punitive or Exemplary Damages

C. Conversion

D. Trespass

E. Interference with Contract

F. Breach of Contract

leaving the court and defense counsel to guess at the underlying factual basis of his assertions. Needless to say the plaintiff also found it unnecessary to cite any statutes or cases in support of his propositions. While plaintiff's lack of diligence raises questions as to the duty of the court to pursue his case for him, the overwhelming weight of the evidence produced at trial illustrates the lack of merit in plaintiff's assertions and allows the court to summarily dismiss all of his claims except the violation of stay claim which deserves discussion.

The Defendants cannot be found guilty of trespass because the security agreement signed by the parties provides the seller with the right to inspect the collateral and furthermore the plaintiff's agent consented to their presence on the farm. The breach of contract charges are without substance as well. The plaintiff claims the defendants' breach occurred when they removed the cattle, yet by his own testimony he admitted to making unauthorized sales of cattle in clear violation of the security agreement prior to July 8, 1982. In addition to the unauthorized sale, plaintiff's failure to provide adequate care for the cattle made him in default of the security agreement. The matter of consent applies to the contract issue also. Testimony at trial by the defendants and the plaintiff's hired hand, Mr. Obringer, indicated that the plaintiff gave Mr. Obringer the message via the telephone that the defendants could take the cattle if they wanted to, which he relayed to the defendants. The fact that plaintiff's agent helped load the cattle supports the defendants' assertion that the plaintiff consented to their action. Consent is also a defense to conversion but that topic will be discussed in detail along with the assertion of the violation of the automatic stay as provided by 11 U.S.C. § 362.

The plaintiff filed his petition for reorganization under Chapter 11 on July 1, 1982. Under § 362 of the Bankruptcy Code, the filing of a bankruptcy petition serves as an automatic stay of most actions against the debtor. The stay is one of the "fundamental debtor protections" provided by the Bankruptcy Act, designed to "stop[ ] all collection efforts, all harassment, and all foreclosure actions" against debtors. S.Rep. No. 989, 95th Cong., 2d Sess. 54, *reprinted* in 1978 U.S.Code Cong. & Ad. News 5787, 5840. Without notice or knowledge of the stay, the defendants repossessed their collateral with the help of plaintiff's agent on July 8, 1982, technically in violation of that stay.

When there is a willful or deliberate violation of the stay the court may intervene and punish the wrongdoer by finding him in contempt and awarding damages and attorney fees. However such severe sanctions are not appropriate in this matter because the defendants made every effort to ascertain if there was a stay in effect. Those efforts included questioning the plaintiff's brother in law, his hired hand and having their own attorney make inquires with the Clerk's Office. Thus proving that the violation was not willful or wanton.

The automatic stay is effective upon the date of the filing of the petition, and formal service is not required. *In re Miller*, 22 B.R. 479, 491, 7 CBC 2d 124 (D.Md. 1982). Several courts have found that although there was no knowledge or notice of the stay, a violation even though inadvertent required awarding attorney fees to the debtor. *In re Conti*, 42 B.R. 122, 12 BCD 87 (Bankr.E.D.Va.1984); *In re Gray* 41 B.R. 759 (Bankr.S.D.Ohio 1984); *In re Crabtree*, 31 B.R. 95 (Bankr.S.D.Ohio 1983); *In re Lowry*, 25 B.R. 52, 9 BCD 1127 (Bankr.E.D.Miss.1982); *In re Womack*, 4 B.R. 632, 6 BCD 543 (Bankr.E.D. Tenn.1980). However in all of those cases after the initial technical violation occurred the creditor, through further action or inaction, caused the debtor to resort to the courts to enforce his rights. This opinion which finds a technical violation, but does

not award attorney fees, does not disagree with or weaken those opinions. This Court realizing that important factual differences exist between the aforementioned cases and the present matter has chosen to follow another line of cases that recognize where the debtor is primarily responsible for the creditor not knowing of the stay it would be unfair to punish creditors who acted in ignorance and "because the bankrupt's unreasonable behavior contributed to the creditor's plight." *In re Matthews*, 739 F.2d 249, 251 (7th Cir.1984) *see also In re Smith Corset Shops, Inc.*, 696 F.2d 971 (1st Cir.1982); *In re Adkins*, 28 B.R. 554 (Bankr.N.D.Miss.1983); *In re Ferrando*, 29 B.R. 696 (Bankr.E.D.N.Y.1983). This case is even more compelling because instead of dealing with financial institutions which are equipped with legal staffs that are experienced in creditors' rights the court is confronted with ordinary citizens who took all possible precautions to not violate the law and who because they are not regular merchants are unlikely to be in this position again. Therefore this court, in applying the equitable principles which govern the exercise of bankruptcy jurisdiction, *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966), has decided not to impose any sanctions on the defendants arising from the application of § 362.

■ The first circuit was confronted with a similar problem in *In re Smith Corset Shops, Inc.*, 696 F.2d 971 (1st Cir. 1982). In *Smith* the creditors leased shop space to the debtors. The debtors defaulted on their rent and the creditor brought an action against the debtor for trespass and ejectment. The debtor received actual notice but failed to appear so the court entered a default judgment. Unknown to the court and the creditor was the fact that the debtor had filed for reorganization under Chapter 11 four days prior to the judgment.

The creditors acting under the court order had the debtors goods removed to a warehouse. At the creditors' trial in bankruptcy court evidence was produced that one of the debtor's employees was present and actually helped to remove the goods.

The debtor then sued the creditor for conversion. The bankruptcy court ruled that the creditors were not guilty of conversion notwithstanding the automatic stay. A bankruptcy appellate panel reversed but the first circuit reinstated the bankruptcy court's decision in favor of the creditors based on equitable principles and the behavior of the debtor.

The First Circuit in *Smith, supra* at 977 when deciding not to impose any sanctions on the creditor considered the effect of their ruling on § 362 and stated "We only hold that Smith could not remain stealthily silent when it knew that the goods were being moved pursuant to court order and then turn around and successfully sue the Brodeurs for the alleged conversion of the goods. We do not think congress envisioned any such misuse of the automatic stay." Following the *Smith* decision the Seventh Circuit in *Matthews, supra* at 251 held "suspension of § 362 automatic stay provisions may be consonant with the purposes of the Bankruptcy Act when equitable considerations weigh heavily in favor of the creditor and the debtor bears some responsibility for creating the problem." While some courts have gone so far as to say that there was no violation of stay *Adkins, supra* relying on *In re Abt* 2 B.R. 323, 5 B.C.D. 1237 (Bankr.E.D.Pa.1980) this Court merely holds that based on the equities of this case it would be unreasonable and unproductive to punish the defendants.

In this case the plaintiff filed bankruptcy, purposely told no one including the man he left in charge of his farm, and immediately left the state. When the creditors came to check on the deteriorating condition of the cattle as they had a right to do, the plaintiff had the opportunity to talk to them via the telephone but instead chose not to and according to testimony went so far as to say the defendants could take the cattle if they so desired. This fact situation is just one small step away from a debtor who in bad faith files to reorganize when he knows there is no chance of his survival and then baits his trap by allowing the deterioration of the collateral while remaining silent and out of sight as his creditors begin repossession, all along the debt-

or hoping to get rich on damages for conversion by using the court as his tool to complete the scheme. This Court refuses to be a part of any such scheme nor does it see the benefit of any sanctions in this case especially in light of plaintiff's silence and the deteriorating nature of the collateral which required quick action.

Damages are awarded in violation of stay cases to restore the debtor to the status quo. Since the value of the cattle was below the amount owed to the defendants, it would seem that the plaintiff's only claim would be for the profits lost during the time the defendants held his cattle. Yet at no time did the plaintiff produce figures which showed what his net profit would have been during that time. Of course the plaintiff would be unable to do so if he was losing money on the cattle which appears to be the case. This fact is corroborated by the testimony of Mr. Oerhtman who said the cattle didn't produce enough milk to pay for their feed. Actually the thrust of plaintiff's valuation testimony was directed at what the resale value of the cattle should be. All witnesses agreed the market price for all cattle had decreased substantially since the plaintiff had purchased these cattle from the defendants. Obviously the market price is irrelevant when the plaintiff would not be entitled to any of the proceeds.

Finally it is important to note that the plaintiff was not forced to come into court to seek the return of his cattle or to restore him to the status quo. The cases which award attorney fees for technical violations of stay are unanimous in pointing out that it would be unfair to make the debtor "incur legal expenses to enforce rights given ... under the Bankruptcy Code." *In re Conti*, 42 B.R. 122, 12 BCD 87, 90 (Bankr. E.D.Va.1984). Therefore if there was no need to resort to legal action such as in this case where the defendants offered to return the debtor to the status quo there are no grounds for attorney fees. This line of thought is evident in *In re Lowry*, 25 B.R. 52, 9 BCD 1127, 1130 (Bankr.E.D.Miss. 1982) where the court which did award attorney fees said at the moment the creditor learns of the stay he has an obligation to restore the debtor to the status quo. It follows then if the creditor reversed his actions there is no need for attorney fees. Furthermore in another case which also awarded attorney fees for a violation of stay the court noted that there was no evidence of consent. *In re Zartun*, 30 B.R. 543, 8 CBC 2d 1103 (Bankr. 9th Cir.1983). Thus the presence of consent undermines debtor's right to damages for a violation of stay as is the case in the present matter.

Due to plaintiff's conduct in being less than honest and forthright with the defendants by failing to advise them of the bankruptcy when he had the opportunity to do so, and after consenting to the repossession with his agent assisting therein, the defendants' good faith effort to keep their actions within the bounds of the law, and having no actual notice of the bankruptcy or the stay, the court finds under the circumstances of this case that an award of damages or attorney fees is not justified and plaintiff's complaint should be dismissed.

In light of the foregoing, it is hereby,

ORDERED that plaintiff's complaint be, and it hereby is, dismissed with prejudice.